Filed 8/9/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SHERILL LYNN SMOTHERS,<br><br>        Defendant and Appellant. | A156081<br><br>(Contra Costa County<br>Super. Ct. No. 51613181)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered the opinion filed herein on July 20, 2021, be modified as follows:

At page 53, in the first full paragraph beginning "Accordingly, we are compelled," the following sentences are inserted following the parenthetical citation: "We further remand the case for retrial at the option of the People. Our opinion does not foreclose retrial of the Penal Code section 187, subdivision (a) murder charge on a conspiracy theory of liability."

The petition for rehearing filed on August 4, 2021 is denied. There is no change in the judgment.


Dated:  ___August 9, 2021___          ____FUJISAKI, J. ____ Acting P.J.

1

Trial Court:      Contra Costa County Superior Court

Trial Judge:      Hon. John W. Kennedy

Counsel:      Xavier Becerra, Attorney General, Lance E. Winters, Chieg Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and David H. Rose, Deputy Attorney General for Plaintiff and Respondent.

Law Offices of Gary K. Dubcoff, Gary K. Dubcoff, for Defendant and Appellant.

Filed 7/20/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>SHERILL LYNN SMOTHERS,<br><br>        Defendant and Appellant. | A156081<br><br>(Contra Costa County<br>Super. Ct. No. 51613181) |

In 1983, Marsha Carter was found dead from multiple sharp-force injuries. Her fully clothed body was located 10 days after she disappeared from her home in Richmond, California, where she apparently was attacked and possibly murdered. She was found in the trunk of her car, which was parked at a West Sacramento motel—miles from her home. Various leads came to the attention of the Richmond Police Department, however, its investigation did not result in any charges being filed and the case went inactive for many years.

In 2008, investigators began processing evidence from the case for DNA, using analytical procedures unavailable to law enforcement in 1983. The results of the DNA analysis of blood found in Carter's home pointed to Sherill Smothers, a man Carter was dating in 1983 around the time she was murdered, who had been a suspect in the initial 1983 investigation. In 2016, Smothers was charged with Carter's murder and an enhancement was alleged for use of a deadly and dangerous weapon.

1

Investigators also discovered scrapings from beneath Carter's fingernails which contained DNA from an unknown male who was not Smothers or any of his known associates. The unknown male sample was entered into the Federal Bureau of Investigation's Combined DNA Index System (CODIS), a national database of DNA profiles. It yielded a match to a man named Kevin Sennett, who appeared to have never had any known connection to California, Carter, or Smothers. To complicate matters further, the information the parties initially had about Sennett was that in 1983 he had been a member of the Army reserves in Texas.

Defense counsel moved to introduce evidence of the DNA match to Sennett in support of Smothers's third-party culpability defense. Following an extensive hearing, the trial court, over the prosecutor's objection, granted the defense motion and told counsel he could present this evidence to the jury.

At trial, the prosecution relied on alternative theories to establish Smothers's culpability for Carter's murder, including an uncharged conspiracy theory. The jury heard testimony that Carter had a broken fingernail with blood underneath, and that the fingernail break could have been a defensive wound possibly caused by Carter scratching or coming into contact with her attacker. The jury also heard testimony that the DNA found in the scrapings beneath Carter's fingernails matched a male who was not Smothers or any of his known associates.

Defense counsel, however, never introduced evidence that the DNA evidence was matched to Sennett, and Sennett's name was never mentioned during trial, even though the court had given him the green light to do so. The defense presented no witnesses and Smothers did not testify.

The jury found Smothers guilty of murder but found the sentencing enhancement that he had wielded a dangerous weapon to be *not* true.  As the trial court correctly observed, the jury's verdict was most consistent with the theory that Smothers conspired with a third party—likely Sennett, a name unknown to the jury—to kill Carter and that the third party, based on the DNA evidence, likely was the killer.

On appeal, Smothers raises multiple errors including that the court (1) improperly denied his motion to dismiss based on the delay in bringing charges against him, which violated his rights to due process and a fair trial, and (2) that Smothers was denied effective assistance of counsel due to his counsel's failure to present evidence of Sennett's identity to the jury.

We are compelled to conclude that Smothers's trial counsel was ineffective for not presenting the available Sennett evidence, including his identity, to the jury.  The People's key witness (who by the time of trial was dying of stage four lung cancer) testified via a conditional examination that Smothers tried to get him and/or other local friends to help him kill Carter.  He never mentioned the existence of a clandestine hitman from out-of-state.  To say the least, this witness' testimony was shaky for a variety of reasons, hence until the police were able to place Smothers at the probable murder scene via DNA evidence, the prosecution believed there was not enough evidence even to charge Smothers.

One of the elements the prosecution had to prove to convict Smothers of the uncharged conspiracy to commit murder was that Smothers had the specific intent to enter into an agreement with someone to kill the victim, Carter.  Based on the People's key witness' testimony there was evidence that Smothers entered (or tried to enter) into an agreement to kill Carter with the key witness and other local mutual friends.  However, there was no DNA

3

evidence placing these co-conspirators at any of the crime scenes—the likely murder scene or inside the car that transported Carter's body to Sacramento. The only DNA evidence matches that were found at the probable murder scene belonged to Smothers and Sennett.

There is *no* evidence that Smothers entered into an agreement with Sennett to kill Carter. There were no financial records, no phone records (the Internet was basically nonexistent in 1983), and no eyewitness testimony that these two men who from all outside appearances, were from completely different worlds, had ever even crossed paths let alone conspired to commit Carter's murder.

We can see no reason why, under these circumstances, defense counsel would not have wanted facts relating to Sennett and his identity before the jury. The trial court told him he could introduce the evidence reasoning that if Sennett's DNA was under Carter's fingernails that meant Sennett was in California—no matter how he got there. It would have only inured to the benefit of the defense to use this fact to argue that the prosecution could not prove a key element of their conspiracy theory, i.e., there was no evidence Smothers entered into an agreement with Sennett to kill Carter because there was no evidence of any connection between the two men.

Instead, based on the evidence they heard, the jury likely concluded that Smothers was finally able to locate some local acquaintance to help him kill Carter, which would have been a conclusion supported by the evidence the jury heard. We will never know whether this jury would have reached the same conclusion if they had been told Sennett's identity and heard there was no known connection between him and Smothers let alone an agreement between the two to murder Carter.

In addition, we conclude the trial court properly exercised its discretion when it denied Smothers's motion to dismiss the indictment against him on grounds of pre-accusation delay. Recognizing that this case may be retried, we also point out potential appellate issues with respect to the conspiracy instructions which should be considered in the event of a retrial.

We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1983, 25-year old Marsha Carter was murdered. She lived in Richmond, California with her four sons, including then 9-year old Travis Carter, Jr., his 1-year old brother, and two other brothers, ages 11 and 7. No prosecution occurred following the investigation by police, and the case eventually became inactive.

Beginning in 2008, investigators from Contra Costa County's "cold case unit" began analyzing DNA from biological evidence collected at Carter's house when she disappeared. The DNA was compared to known DNA samples obtained from suspects in the 1983 investigation, including Smothers. In August 2016, a grand jury returned an indictment charging Smothers with murder under Penal Code section 187, subdivision (a), and alleging an enhancement under Penal Code section 12022, subdivision (b)(1) for use of a deadly and dangerous weapon.

The trial took place over the course of nearly two months in 2018.

### A. Motions Regarding Third Party Culpability Evidence

At the start of trial and prior to any witness testimony, both parties filed motions on third-party culpability evidence. The People moved to exclude it, while Smothers moved in limine to allow it. Smothers's motion stated that the defense "anticipate[d] expert testimony showing that DNA

5

belonging to Kevin Sennett was found underneath Marsha Carter's fingernails."

Nearly two years earlier, in June 2016, investigators at the Contra Costa County Office of the Sheriff's Crime Lab (Crime Lab or Lab) had developed a partial DNA profile from the scrapings found beneath Carter's fingernails. It did not match Smothers or any of his known associates. The Crime Lab entered the profile into CODIS. There were two hits, one of which was to Kevin Sennett.[1] The Crime Lab informed the investigating officer, Lieutenant Stina Johanson, that these matches "constitute[d] an investigative lead" and justified issuance of a warrant for a reference sample from Sennett.

Before the grand jury hearing in August 2016, Lt. Johanson found and contacted Sennett in Florida. Sennett informed her that in 1983, he was in the Army in Texas, that he knew no one by the name of Marsha Carter, and he had never been to California. Meanwhile, defense counsel attempted without success to find evidence that Sennett had been in the Bay Area in December 1983.

While the third-party culpability motions were pending, the People obtained a buccal swab from Sennett, who provided the sample voluntarily without the need for a subpoena or court order. The Crime Lab examined the swab and developed Sennett's DNA profile. On August 10, 2018, while trial was underway but before opening statements, the Crime Lab concluded that Sennett's DNA profile was included in the partial DNA profile deduced from Carter's fingernail scrapings. Sennett is Caucasian. According to the Crime Lab, the probability of encountering a Caucasian with a DNA profile that can

---

[1]     The second hit was the result of clerical error, and that match was subsequently excluded.

6

be included in the partial profile, when that individual is drawn at random from a population of unrelated individuals, was 1 in 2.4 million.

On August 20, 2018, the court granted Smothers's motion, allowing him to present any third-party culpability evidence related to Sennett's DNA. In ruling, the court explained, "I think the DNA evidence relating to Mr. Sennett is admissible because it could create reasonable doubt as to the defendant's guilt. I think a reasonable argument is that whoever it is, whether it's Mr. Sennett or a third male, unidentified, whoever's DNA is under the victim's fingernails if there is a male under her fingernails, may very well be the person who killed her because of the defensive wounds and the broken fingernails. [¶] . . . It's a circumstantial connection of a third-party, whether it's Mr. Sennett or not, to the perpetration of the crime, and I think the defense is entitled to present it." Opening statements and witness testimony followed.

### B. Travis Carter, Jr. Testimony on Mother's Disappearance

The prosecution's first witness was Carter's second eldest son, 44-year old Travis Carter, Jr., who was nine years old at the time of his mother's death.

In 1983, the family was living in a single-family home in Richmond. An uncle lived with them, and another woman lived there as a roommate. Carter worked during the day and attended school in the evenings. At home, she ran an organized operation which emphasized timeliness and cleanliness. The older boys maintained regimented chore schedules which included washing dishes daily, tidying their rooms, cleaning the two bathrooms in the house twice a week, and vacuuming regularly.

Sometime in the spring or summer of 1983, Carter and Smothers began dating. Around this time, Smothers came over to the house two or three

times a week and occasionally spent the night.  In the fall of 1983, they broke up.  Smothers tried to reunite with Carter and came to the house a few times in the months after the break-up, but Travis rarely saw Smothers during this period.

By early December 1983, Travis's uncle and the roommate had moved out.  In early December 1983, Travis saw Smothers come by the house daily over the course of a three-day period.  By this time, it had been months since Smothers had actually spent the night at the house.  The visits upset his mother to the point where Travis and his brothers were scared.

The first of these visits came on Sunday, December 4th.  That day, Smothers stopped by the house and spoke with Carter at the front door but Travis could not definitively say Smothers ever entered the house that day.  For a while, his mother and Smothers talked normally, but the conversation soon became disagreeable.  Carter blamed Smothers for vandalizing her car, which Smothers denied.  The conversation lasted between 5 and 15 minutes, before Carter shut the door in Smothers's face.

The next day, Monday, December 5th, Smothers returned.  He had gifts for the boys and came inside for 30 minutes or an hour.

On Tuesday, December 6th, around 6:00 p.m., Smothers returned to the house and briefly visited with Carter at the front door.  The boys eavesdropped on the conversation, and Travis heard his mother say, "You know what, this just isn't going to work, it's not going to work."  Smothers responded, "You know, I think we can work this out.  I think we can do this."  After a couple of minutes, she slammed the door on him and Smothers left.

About an hour to an hour-and-a-half later, the phone rang and Travis answered.  The caller was a man, but Travis did not recognize his voice and passed the phone to his mother as the caller requested.  Travis heard his

mother say, "This is just not going to work out. We just don't get along." He did not remember how long the call lasted although phone records indicated the call was 71 minutes long.

That night, Travis went to bed in the room he shared with his younger brother. He did not hear any unusual noises during his sleep.

On the morning of Wednesday, December 7th, Travis woke around 6:00 or 6:30 a.m. to the sound of a "car pulling off" but stayed in bed. Travis's brother got out of bed and left the room. He came back and said, "Mom's gone."

Travis got up, thinking it was odd his mother was gone because it was inconsistent with the usual routine. The entire house, which was normally "[v]ery tidy," was "ransacked." The front and back doors were open, and telephone lines were cut.

Travis, along with two of his brothers, made their way to their mother's bedroom. Upon entering the room, they saw "blood everywhere . . . [¶] . . . lots of blood," though at the time they did know it was blood. Travis looked under his mother's bed for a machete and knife Smothers had given his mother but did not see them. Nor could he find his baby brother.

The three boys ran across the street to a neighbor's house. The neighbor called the police, who soon arrived at the scene.

On cross-examination, Travis acknowledged that he and his brothers were regularly attending school in the weeks and months prior to their mother's murder. He agreed that if someone came over to visit while he was at school, he would not have known. Sometimes, Travis also stayed overnight with his father, so would not know whether his mother had a visitor over while he was with his father.

9

Travis further acknowledged that when he was interviewed by police officers on December 7th, he told them that on one of the nights between December 4th and December 6th, Smothers had stayed for an extended period, perhaps until morning. He acknowledged that he did not know if Smothers was at the house for 15 minutes or 4 hours on December 4th, but said it was hard for him to think that Smothers stayed a long time because they were scared of him. He also stated that other than his father, who had since died, he had never told anyone previously he was afraid of Smothers.

Asked to look at a picture of the common bathroom taken on December 7th, he acknowledged there was an ashtray with debris even if no one who was living at the house at the time smoked. After seeing pictures of beneath the bed, he also acknowledged the machete was still there.

### C.     Police Response/Evidence Collection at the Carter House

Numerous Richmond Police Department officers responded to the neighbor's call that day. These included Louis Bajza, who was the lead detective on the case; Richard Terry, a homicide detective; Robert Louis Flores, an officer; and Wayne Cunningham, the crime scene investigator. Three decades later, these officers, all since retired from the Department, testified at the trial.

Officer Flores was the first officer to reach the Carter house that morning. After speaking with the neighbor, Officer Flores entered the home through the open front door. Alerted by the neighbor, he went to the master bedroom and found it a "bloody mess." There were bloodstains on the mattress and blood spatter on the pillows and on boxes in the room.

Officer Flores had been told that Carter's youngest son was missing, so he was on the lookout for the infant. He found him appearing physically

unharmed lying on his stomach underneath the bed in the master bedroom. With the help of other first responders, he removed the baby from the house.

Responding officers who testified at trial also recalled the house was in disarray. The back door to the porch was open. The kitchen telephone was off the hook and on the floor, and the cord had been cut or torn. Officer Flores looked but found no signs of forced entry.

Officers also saw spots of blood outside the house. There was a spot of blood on the back porch steps and blood on the driveway in front of the garage door.

Inside, officers saw significant blood stains and spatter throughout the master bedroom, including on the bed and floor. In the bathroom attached to the master bedroom, responding officers observed what appeared to be blood, too. Detective Bajza saw in the sink "what appeared to be red spots, possibly blood spots." Officer Cunningham saw the spots, too. Neither could remember whether these spots in the sink were wet or dry. In addition, Detective Bajza observed that beneath a hanging white towel, there was a damp light blue nightgown with a red stain that "appeared to be blood." On the wall, there was also a spot that appeared to be blood.

As the crime scene investigator, Officer Cunningham was the evidence technician, and he collected and preserved evidence. Outside the house, he collected a shoeprint left on a piece of cardboard. He also collected swabs of the red substance found on the driveway and on the back porch. Inside, he collected the mattress cover next to the bed, congealed blood from the carpet, and swabs from the blood on the bed. From the master bathroom, he collected the nightgown, and took samples of the substance in the sink and on the wall. He confirmed that photos no longer existed of the blood spots in the master bathroom sink because they had gone missing. The only bathroom

11

photo that remained was of the common bathroom, which depicted an ashtray with a cigarette butt on the counter. In addition, Carter's car was missing.

Detective Terry interviewed Travis. He prepared a report of his interview, which he was asked about on cross-examination. Based on his report, Terry confirmed that during the 1983 interview Travis had told him that Smothers had stayed late on December 5th. He said that the first argument between Carter and Smothers that Travis told him about occurred on December 6th. Travis also told Detective Terry he thought the man who called on December 6th was his youngest brother's father, but really was not sure who it was. In addition, he told Terry that in the early morning of December 7th, he woke sometime between 4:00 and 5:00 a.m., got up, used the bathroom, and saw his mother and brother still on the living room couch. He also said his baby brother's cries woke him that morning.

**D.     Initial Police Investigation and Discovery of Carter's Body**

On December 8th, Detective Bajza spoke to Smothers at his parents' house, where he lived. When they spoke, Detective Bajza did not observe any cuts on or injuries to Smothers's hands or face. After obtaining Smothers's consent, Bajza searched his room. He did not find anything connecting Smothers to Carter's disappearance.

On December 17th, Carter's car was found in a motel parking lot in West Sacramento off of Highway 80. Carter's body was in the trunk. She was fully clothed. The discovery of Carter's body in the car in the motel parking lot was reported in the local news.

Dr. Ransdell was the pathologist who performed the autopsy the same day the body was discovered. At trial, Dr. Ransdell was unavailable (he had since died), so Dr. Arnold Josselson, a forensic pathologist, testified about the

autopsy though he did not personally conduct it.  Dr. Josselson based his testimony on his review of Dr. Ransdell's report, the coroner's investigative report, and photos of the 1983 autopsy.

Dr. Josselson observed deep wounds to Carter's body, some of which were almost certainly inflicted with a knife.  He also observed some superficial wounds consistent with a knife but he could not conclude that another sharp instrument did not cause them.  There was also a large incised wound in the left lower portion of her chin caused by a sharp object. Dr. Josselson noted defensive wounds on Carter's hands and forearms, which he characterized as sharp-force injuries suffered as she attempted to ward off the attack.

He detailed injuries to Carter's neck.  Her larynx, or voice box, suffered a sharp-force injury that prevented her from screaming or talking.  On each side of her neck, there were two sharp-force injuries across the carotid artery, which supplies about 75% of the blood to the brain.  It was Dr. Josselson's opinion that Carter bled to death.  Once her carotid artery was cut, she rapidly lost blood and then lost consciousness.  Within minutes, she likely died.

On cross-examination, Dr. Josselson was asked about one of Carter's fingernails,  which based on a photo, appeared to be broken.  There also appeared to be blood in the area where the nail broke but he could not say whose blood it was.  In light of the blood, this could have been a defensive wound possibly caused by Carter scratching or coming into some other contact with her attacker.  Dr. Josselson agreed that the area under the nail could trap someone else's DNA, and that it was common practice for pathologists to take scrapings from underneath fingernails to look for DNA from the perpetrator.

13

Detective Bajza, who attended the autopsy, described some of what he saw. He, too, confirmed that Carter suffered numerous stab wounds and cuts. He also noticed one of Carter's hands had been clasping several strands of hair, which were collected. The criminalist from the Department of Justice who analyzed the hair concluded it could not be excluded as having come from Carter or one of her relatives. The criminalist also concluded that Smothers and Mayfield could be excluded as a source of the DNA of the hair strands in Carter's hands.

Detective Bajza also confirmed that a rape examination kit was collected at the autopsy. The criminalist with the Crime Lab who analyzed the kit found no semen or foreign pubic hair present.

### E. Ongoing Police Investigation Leads to Calvin Featherson

Meanwhile, the police investigation brought officers to Calvin Featherson, who contacted the police and was interviewed by officers on December 18th, the day of or day after Carter's body was found and reported in the news.

Detective Bajza and another detective conducted the interview, which took place in the middle of the night and was recorded. The recording was played to the jury, and a transcript of it was also admitted into evidence. While many of Featherson's statements were unintelligible, he shared with the detectives the following information.

By 1983, Featherson had known Smothers for about 15 years. They lived on the same block in Oakland. One day, Featherson returned home and saw Smothers standing on his porch ringing his doorbell. Smothers asked him if he could kill someone. Smothers never told Featherson the name of the woman he wanted to kill, only that she lived in Richmond. Featherson suggested Smothers reach out to Martin Mayfield, a mutual friend in the

neighborhood who they had known for a long time and who Smothers had already been trying to find for a couple days. If Featherson ever ran into Mayfield, Smothers asked Featherson to let Mayfield know he was looking for him.

In this interview, it was not clear whether Featherson agreed to Smothers's request for help. Whether Featherson agreed or not, he shared details with officers about Smothers's plan.

According to Featherson, Smothers was going to persuade Carter to let him inside the house, and once in, he would manage to unlock the back door. Upon receiving a signal from Smothers, Featherson was supposed to come in the back door and then "he wanted her strangled. He was gonna hold her (nose or somethin') and I strangle her." Smothers told him "he didn't wanna leave nothin' messed up. Nothin'. Uh, (If anything) act like it was, like, a burglary, takin' the stereo or somethin', you know, act like it was somebody broke in the house and – and not lookin' to kill."

After they killed her, Smothers told him that they would put her body in the trunk of her car. Smothers would drive Carter's car, and Featherson was supposed to follow driving Smothers's car. They would get on Highway 80, take the body to Sacramento, and "get off on [the] west – something" exit. Smothers planned on leaving Carter's car in a hotel parking lot and then taking off with Featherson in his car. Later, Featherson added that Smothers told him to tell Mayfield that if all three of them were involved, Featherson was going to do the driving, and Mayfield and Smothers were "gonna do – do the thing."

Featherson added that on the same day Smothers approached him for help, he accompanied Smothers to downtown Oakland to what Featherson understood to be Smothers's bank. Smothers went inside the building, got a

15

map, and came out to rejoin Featherson who was waiting in the car where they reviewed the map. Featherson said Smothers pointed out Highway 80 and the Jefferson exit and asked whether he could handle the job. Asked when Smothers reviewed the map with him, Featherson stated "maybe a couple of days" before he planned the murder. Asked again, Featherson stated, "I'll say a day before the (event)."

Asked whether the murder had been planned to take place at night, Featherson replied, "Um, y-heah, sometime when the kid's asleep, (now) exactly what he told me, 'When the kid go to sleep.' Or something' like that." When asked if Smothers worked nights, Featherson said he delivered newspapers at 3:00 to 4:00 in the morning, and that Smothers said he had to work. That meant "[i]t was either the Thursday or a Sunday 'cause he (had to work)."

On the night Smothers asked him for help, Featherson made audio "tapes of what's real" and gave them to his friend, Ragon "Little Guy" Magee. He instructed Magee, " 'If anything happen to me, then you send this tape off.' "

Some evening later, around 10 p.m., Featherson got a call from Smothers, who asked whether he was going to help him out. Featherson said no. After the call, he went outside and saw Smothers and Mayfield sitting in Smothers's car laughing together. He said Smothers asked another friend named Vincent to also ride with him that night but that friend declined, too. Featherson said Smothers still planned to come by Featherson's house and honk the horn so he could join them, but Smothers never came.

Since Smothers never came to his house that night, Featherson recovered the tape from his friend and erased it. He figured nothing happened and Smothers decided not to go through with it. Later in the

16

interview, he said, "I made this tape up. My voice only of – of – of the plan and, uh, so it's in like me – my, uh, drawer. A certain drawer where nobody goes in." Featherson also said he "told all – everybody, my brother, my homeboy friends, ya know" the details of what Smothers wanted him to help him do.

Featherson observed the similarities between the plan Smothers shared with him and the crime reported in the news. He said, "So it happened the same way, you know, with him and (Martin) did it the same way." He further added, "From the news, they say she was in her trunk from Richmond to Sacramento and I said, 'Well-well, you know, he told me . . . the same thing.'" Contemplating that Carter was stabbed not strangled, Featherson speculated that Smothers and Mayfield may have changed the plan so that Featherson would think somebody else committed the murder. He then told the officers that Carter owed Smothers at least $2000, and that Smothers told him he was trying to get money back from her. Smothers told him he wasn't able to get the money back from her, so "he couldn't do none other than kill her."

Featherson had difficulties pinpointing exactly what day Smothers had approached him at his house and what day Smothers followed up with the 10:00 p.m. call asking Featherson if he was going to help him. Asked when Smothers made his plan, Featherson responded, "A day before she died probably."

Asked again what day of the week this conversation happened, Featherson responded, "It mighta been weekday – it might been a weekend." He added that the news said Carter died 11 days ago, and that was "the only thing I can go by. I'm not sure . . ." Asked to try to narrow the time span when he received the call from Smothers asking him to come along and then

17

saw him and Mayfield in the car, Featherson replied, "If you tell me what day that was, I'll take your word for it."  When the officer noted December 7th was a Wednesday, Featherson replied, "Yeah.  Okay, thank you.  It was a Wednesday.  The night she was supposed to die was a Wednesday."  When an officer clarified she was found missing Wednesday morning, he revised, "Okay, Tuesday.  Okay, it was Tuesday then.  It was Tuesday morning . . ."  Then he went back to Wednesday.

Featherson then added, "Hey – hey, you know what I think?  I think that it could've, uh, been, uh, they coulda did it before (they asked me).  I'm not sure."  Considering the question further, he repeated that he was not sure when his conversation with Smothers occurred.

Smothers was planning to pay Featherson $500-$600 and "a little bit more" if "no heat [got] on [them]."  Smothers never gave Featherson any money up front.  Featherson observed that about 4 or 5 days earlier, Mayfield had a couple new jackets, some new records, and good weed.

Asked about why he did not go to the police earlier, he explained nobody got killed.  He only went to the police after he learned the victim's name from Mayfield, whom he figured would tell him because he knew Featherson already knew of Smothers's plan and figured he could be trusted.  When he heard Carter's name on the radio, he matched the name to the one Mayfield gave him and then came to the police.  But when asked later if he had talked to Mayfield, he said Mayfield "ain't say nothin' . . . he don't know nothin'."

He characterized Smothers telling him about his plan and not having him help was a "fool move."  He also expressed some concern for his own safety:  "See? That's the trip.  See what I'm saying?  He was a fool at this point.  Now he got enough gall to kill her, why wouldn't he kill me?"

At various points during the interview, Featherson acknowledged his own criminal record. He said he stole to make a living and sold the stuff for money to get by since he did not work but noted that he would not hurt anybody. He said he was cited for shoplifting a week earlier and that he also had a record for burglary.

At the end of the interview, Featherson asked if there was a reward and said he would go for it if there was one. The officers had no knowledge of a reward and informed him he was not going to receive a reward if one were offered.

On December 19th, the Crime Lab processed Carter's car for evidence. The criminalist who processed the car observed blood and bloody smears in the car's trunk and rear bench seat. He processed the car for bloody fingerprints but found none had sufficient detail that would have allowed for an analysis to determine who left the print. The same day, a latent print examiner for the Richmond Police Department also processed Carter's car for fingerprints. He collected potential latent fingerprints from various exterior surfaces (e.g., glass window, bumpers, trunk) and interior surfaces (e.g., inside door release, rear view mirror, steering wheel, gear shift and turn signals, radio controls, etc.) as well. He submitted the latent fingerprints to the Richmond Police Department. A qualified print examiner with the Crime Lab examined the latent prints and discovered five of them had sufficient ridge detail to compare to a known suspect. Of the five, Smothers was excluded as the source of the two fingerprints found on the left rear inside door release, and the remaining three prints located on the car were inconclusive as to him. In addition, Mayfield was excluded as the source of one of the fingerprints from the inside door, and the remaining four prints were inconclusive as to him.

19

On or around December 20th, Detective Terry met with Featherson for follow-up. During that meeting, Terry drove Featherson around downtown Oakland in his unmarked police car until Featherson was able to point out the bank building he said Smothers had taken him to retrieve the maps. Featherson found the building, which turned out to be an AAA Insurance building. He took the maps outside to Featherson and had him indicate the locations where Smothers said they were supposed to bring Carter's body.

On December 22nd, at the request of the police, Featherson wore the first of two wires while speaking with Smothers. The first wire recording was played to the jury and a transcript admitted into evidence. In the recorded conversation, Featherson told Smothers that somebody must be talking to the police because the police wanted to talk to him. He asked Smothers what to do if they asked if he knew anything about " 'this.' " Smothers answered, "No. Listen – listen, be cool. Would you stop tripping. You don't know nothing." Featherson expressed concern about being caught in a lie about the maps, to which Smothers said, "Look. No maps. No nothing." He asked, "[W]hat if they tell me to take a lie detector and they say, 'You know anything about this?' " Smothers responded, "Come here. Come here. Come here. Look, they can't tell you to take a lie detector. . . . [¶] . . . . They can't tell you to do nothing. Don't do it. Don't do it." Smothers added, "You never seen no maps. Have they asked you about no maps?" Featherson said he had not been asked but was still worried about a lie detector test. Smothers suggested he "[j]ust act normal. You don't know nothing . . . and you don't . . . [¶] . . . You ain't see me do nothing." Smothers repeated that Featherson did not need to talk to the police. He advised, "Just say, 'I ain't got nothing to say.' That's all. Simple as that." Featherson said, "I know you did nothing but hey, I

20

ain't going to jail for nobody," to which Smothers replied, "Yeah. That's how I feel."

Smothers further told Featherson to tell officers that he and Smothers were not friends because Smothers's mother thought Featherson broke into their house. He told Featherson, "Be strong too. So if I was you hey, I'd just simply tell them, uh, 'I don't have nothing to say. I mean, I saw [her] on TV and that's all I know.'" Smothers then stated, "Look, I never discussed it with you. You never saw her. Okay. You never saw her except for television. . . . You don't know nothing about it." At one point, Featherson asked Smothers if the police found maps with him. Smothers asked in response, "[W]hy the heck you think they asking people? They ain't got nothing." He also noted the police were at Mayfield's house, but that he was "so cool under pressure."

The next day, December 23rd, Featherson agreed to wear another wire. The second wire recording was played to the jury and a transcript of the recording admitted into evidence. Featherson began the conversation with a ruse, telling Smothers that after they spoke the previous day, the police snatched him, gave him a lie detector test, and accused him of lying. Smothers asked, "Did you tell them about the map?" Featherson said, "Nah, nah." He repeated the police gave him a polygraph and wanted to see how well he knew Smothers. He said he flunked the test, and the officers made him sign something or they wouldn't release him. Featherson then told Smothers, "You could kick me something down man," and Smothers replied, "Okay." Featherson repeated his request to Smothers to "[k]ick me something," adding "I ain't had nothin' to do with it, man, y'all did that to baby, y'all did this to . . . " Smothers replied, "I – I didn't - I didn't . . ." Featherson said the police were "trippin' with me 'cause they think that I

might do your dirty work for you." Smothers answered, "You haven't. I don't know, but fuck, you don't have nothin' to do with it, I don't have nothin' to do with it, I don't – I don't know." Featherson then appeared to ask for money again.

Featherson then told Smothers he shared some information with the police. He said he told officers: "Sherill knew baby and he said that he was tired of stayin' with her, that's all. I told him, I said, hey, you know, man, he – he don't want to be with her no more and he was going to mess up her car." Smothers responded, "Why you tell 'em that stuff? . . . [¶] . . . You don't know nothing'." Later, Smothers said, "Look, just tell them you don't know anything. You and I aren't even friends." The conversation concluded with Featherson asking Smothers for some money.

On January 12, 1984, Detective Terry contacted Mayfield and took his fingerprints. While Mayfield allowed his prints to be taken, he refused to sign the card indicating that he provided his fingerprints on his own volition. Mayfield asked for his fingerprint card back, but Detective Terry said he was keeping it.

### F.     Case Turns Cold Without a Prosecution

No one was prosecuted for Carter's murder following this initial police investigation, and the case became inactive.

### G.     Resumption of Investigation Decades Later

In 2008, Lt. Johanson, who was then an officer, was assigned to Carter's case. At that point, she began submitting biological evidence from the case to the Crime Lab for DNA analysis. The evidence was sent in phases over a period of years. According to Lt. Johanson, this "methodical" approach provided the best way to obtain DNA evidence while not overwhelming the Lab.

Evidence sent to the Crime Lab to be tested for DNA evidence included the evidence collected from the master bathroom: the nightgown, the red substance on the wall, and the sample taken from the bathroom sink. Samples from the blood found on the back steps and in the driveway were also submitted for DNA analysis. Lt. Johanson also sent the scrapings obtained from under Carter's fingernails during the autopsy.

In June 2015, Lt. Johanson collected a buccal swab from Smothers at his home. She had a warrant but did not need to show it to Smothers given his cooperation. Johanson also collected a buccal swab from Mayfield. Neither Mayfield nor Smothers matched the DNA taken from under Carter's fingernails. Featherson's DNA was also collected by police officers in Milwaukee, where Featherson lived, and was sent to Johanson.

Johanna Estrada-Ballardo, a criminalist in the Crime Lab, was qualified to testify as an expert in biological fluid examination, DNA analysis, and statistical analysis. Her job was to examine physical evidence from Carter's case for DNA and to draw conclusions based on her findings.

Estrada-Ballardo explained DNA analysis: the extraction of DNA from a sample of evidence, the quantification of DNA present in the sample, and then the analysis and interpretation of the DNA. When evidence samples are complete, she is able to develop complete DNA profiles and determine whether a match to the DNA of a known person exists, or whether that person can be excluded as the source of the DNA in the evidence sample. If there is insufficient DNA from a given evidence source that is compared to a complete DNA profile of a known individual, she says that a person is "included." She then applies statistics to show how uncommon the evidence profile is in the population.

She further noted that DNA can be a great tool for evidence stored properly, that is, frozen, which preserves the DNA. If not stored correctly or with the passage of time, DNA can degrade. With degraded DNA, there would not be sufficient DNA for her to test, precluding a complete DNA analysis. She would not be surprised if evidence from a 1983 case, prior to DNA analysis, had been stored at room temperature, or in an area that got really hot. She also made clear that just because DNA may degrade, the DNA does not change.

Over the last 10 years, Estrada-Ballardo examined over 50 items in Carter's case. She conducted both DNA analysis and biological fluid identification on the items. She also performed DNA analysis and generated a DNA profile for each of the individuals whose swabs she collected, including Smothers and Mayfield.

Several of the pieces of evidence tested, such as the blood samples taken from the driveway and back porch and the bloodstained mattress pads, did not have sufficient DNA to develop a profile. Other pieces of evidence allowed for development of a DNA profile which ultimately matched that of Carter. There was no blood detected on the machete beneath the bed.

Two pieces of evidence from the master bathroom, however, had sufficient DNA to develop profiles. Estrada-Ballardo conducted a DNA analysis of the apparent bloodstain on the nightgown and developed an unknown male profile which matched Smothers's DNA profile. In her statistical analysis, Estrada-Ballardo added that the probability of encountering an African-American with the same DNA profile as the evidence profile was 1 in 44 sextillion. Smothers is African-American.

Estrada-Ballardo also conducted an analysis of the red substance that had been collected from the master bathroom sink. It tested positive for

24

blood, and its DNA profile was consistent with the profile from the nightgown and matched Smothers. The probability of encountering another person with the same DNA profile as the evidence profile generated from the blood in the sink was 1 in 140 quintillion African-Americans. As for the third piece of evidence collected from the master bathroom—the red substance on the wall—Estrada-Ballardo determined it was not blood and did not test it further.

Estrada-Ballardo further confirmed that she could not say when or how the DNA got on either the nightgown or in the sink. She agreed that the DNA could have been on the nightgown or in the sink for days, weeks, or months. She also acknowledged that it was possible that someone rinsing out the nightgown to eliminate the bloodstain over the sink caused the blood to be deposited in the sink.

Estrada-Ballardo determined the scrapings taken from Carter's fingernails tested positive for blood and that they contained DNA from at least two individuals. The major DNA profile she developed was consistent with Carter's DNA profile. The minor DNA profile, which was a partial profile, belonged to a male. Smothers, Mayfield, and Featherson were all excluded as the source of this DNA. She further explained that physical contact is the typical way one gets someone else's DNA underneath their fingernails, and that DNA could transfer from just casual contact. On cross-examination, defense counsel did not ask whether the male DNA evidence beneath Carter's fingernails had matched to any known person, and if so, the identity of that person. No evidence was introduced as to the identity of the unknown male who matched to this DNA evidence.

Estrada-Ballardo stated that of all the items she examined, Smothers's DNA matched or was included in only the samples from the nightgown and

sink in the master bathroom. She did not find DNA from Mayfield or Featherson in any of the samples she tested from inside or outside the Carter house.

### H.    Featherson's Conditional Examination

Featherson was unavailable to testify at trial due to illness. In 2018, he was suffering from stage four lung cancer, needed to use a feeding tube, and his doctor recommended he not travel to California from his residence in Milwaukee. As a result, the court permitted the prosecution to proceed by conditional examination, and the jury viewed the videotape and transcript of Featherson taken on November 15, 2016.

Featherson testified he was 57 years old. He had been diagnosed with stage four lung cancer and was going through chemotherapy. While he presently lived out of state, he grew up in Oakland. When he was younger, he committed some crimes, including stealing and burglary. To prepare for his testimony and refresh his memory, he reviewed transcripts from when he spoke to police in 1983.

Featherson met Smothers when they were about six or seven years old. They grew up in the same Oakland neighborhood and lived on the same block. As kids, they socialized occasionally but not much since Featherson had a different group of friends. Also, Smothers's parents did not like Featherson since he, his brother, and his friends were "pretty wild." In the early 1980s, when Featherson was in his twenties, he periodically saw Smothers in the neighborhood but they did not hang out. There was no bad blood between the two.

In late 1983, Smothers approached Featherson somewhere on their block and talked about his girlfriend. Smothers told him he was upset with his girlfriend "for something that she did to him and about the

26

relationship . . . turning bad or – or dissolving." Smothers said she had taken advantage of him and referenced money he had spent on her and wanted back. Smothers added that throughout their relationship, "she took advantage of him, played him for a fool." He wanted something done to her vehicle, "wanted to know if I would do something, burn it up or whatever, something of that nature." Featherson did not agree to it.

Two or three months later, Smothers came over to Featherson's house and asked if he could help him kill someone. Smothers said he was very upset with his ex-girlfriend and that he wanted to kill her. He said that "she took advantage of him. . . . [H]e just wanted her gone, 'cut up real bad' is his exact words." He asked how much Featherson would charge to help him. At first, Featherson hesitated to consider whether he would help. Featherson said $500 or $600 because Smothers offered him that amount. Featherson agreed to help but said he was leading Smothers on.

Three or four days later, Smothers picked up Featherson in his car , explained the plan to him, and drove him to downtown Oakland to a bank to get maps of the area where his ex-girlfriend lived and where they would drive her car after killing her. While Featherson stayed in the car, Smothers left to get a couple maps of the Sacramento area.

Two days later between 4:00 and 5:00 p.m., Smothers and Mayfield pulled up in front of Featherson's house and asked Featherson if he wanted to come with them. Smothers did not say where he was going, but Featherson knew what he wanted. Featherson told them he was busy. After they left, Featherson did not know what they did. Later that evening, Smothers called him three separate times, but he did not answer the phone. He never discussed the matter with Smothers again.

27

Featherson stated that he hung out regularly with Mayfield, who also lived on their block, and knew him better than Smothers. Asked if Mayfield's name had come up in his conversations with Smothers, Featherson initially said it had not and that he could not remember it well. He then explained that he had been hesitant with Smothers and "kept putting him off." At that point, Smothers asked Featherson to tell Mayfield he wanted to talk to him. Featherson stated that this occurred during a separate conversation he had with Smothers during this time period, not one of the three earlier ones he had described. He then changed his mind and said this conversation about Mayfield occurred during one of his three conversations with Smothers previously described.

The night he saw Smothers and Mayfield in the car together, Featherson made his own audio recording of what he knew about the case. He told several stories about what he did with the recording. One was that he put it in a personal drawer for safekeeping. Another was that he "passed it on" to several of his friends. In addition, he stated that it remained in his house, and he told his friend Guy McGee about it. He told McGee that if something happened to him, he needed to take the tape to the police. After "days went by and [Featherson] didn't hear anything [about] what had . . . occurred," he erased the tape. By the time he had contacted the police, his recording was deleted.

Ten or eleven days later, Featherson saw news that the body of a young woman named Marsha Carter from Richmond was found in the trunk of her car in a shopping mall or hotel parking lot in Sacramento. At that point, Featherson said, "In a hot second I knew it was her and I knew it was the same girl." Featherson contacted the police.

A few hours later, police came to his house. He told them what he knew, and officers recorded the conversation. He agreed to wear a wire and talk to Smothers.

The prosecutor played recordings of both of his wired conversations with Smothers. Featherson stated that when he asked Smothers to "kick [him] down something," he wanted something for "keeping [his] mouth closed." Smothers gave him $5. Featherson acknowledged that he had asked officers about a reward and was told there was no reward. Even without a reward, he was still willing to have wired recordings with Smothers.

On cross-examination, Featherson explained that Smothers approached him for help because he was "very popular" and people could come to him if they wanted to know how to do a burglary, steal a car, or get weed. He acknowledged he had been convicted in Alameda County for possessing stolen goods in 1978 and for burglary in 1980.

He also said that he had told police during his initial conversation with them that Smothers wanted to cut up his ex-girlfriend " '[r]eal bad.' " However, he did not remember ever telling police Smothers wanted to strangle her. When presented with a transcript of that interview in which he said Smothers's plan was to strangle his ex-girlfriend, he said he did not remember that and then "remember[ed] a little bit because she had children." He confirmed that he found out about the woman being stabbed from the news reports. He said he did not believe anything in the initial recorded statement he made to the police because he did not remember "almost any of it." Asked whether his recollection of what Smothers told him was better in December 1983 or now, Featherson responded, "The same."

With respect to the three phone calls he ignored the night he put off Smothers and Mayfield, he said he knew it was Smothers calling even if he

never picked up the phone " '[c]ause we had a time, when he got off work. I knew it was him." He could not remember telling police that he told Smothers he would not participate in his plan.

Featherson also acknowledged on cross-examination that the second wire continued to record after he finished his conversation with Smothers. He ran into Nathaniel Hayes on the street and discussed where they were going to get weed. Asked if he discussed the case with Hayes and told him " 'I'll blackmail that n******,' " Featherson answered, "No, that's never been done." After being presented with the transcript from the wired recording, he remembered that he told Hayes, " 'Man, I'll drain a n*****'s pockets.' " He agreed that he was trying to blackmail Smothers in order to keep his mouth shut.

The defense presented no witnesses. Smothers did not testify.

## I.     Verdict and Post-trial Motion for New Trial

On September 20, 2018, the jury found Smothers guilty of murder and found the enhancement for use of a deadly and dangerous weapon not true.

One week after the jury reached its guilty verdict, military records regarding Sennett from the National Personnel Records Center, which the People had subpoenaed weeks earlier, reached the parties. These records indicated Sennett was in the Army reserves in December 1983, then living in Wisconsin Rapids, Wisconsin and unemployed. They also included the name of Sennett's ex-wife.

Smothers was scheduled to be sentenced the next day, September 28, 2018, but defense counsel asked for a continuance based on the subpoenaed records, which defense counsel argued were newly discovered evidence requiring further investigation. Over the People's objection, the court granted the continuance. In doing so the court stated, "Most of the

information that's been described was known to all parties at the time of the trial. As I see it the only difference is that the records may indicate that Mr. Sennett was in Wisconsin as opposed to Texas, that he was in the Army reserve as opposed to active duty in December of 1983. I'm not sure how much difference that makes when the information was otherwise available to the defense."

On October 2, 2018, defense counsel's investigator located and interviewed Sennett's ex-wife, the former Deborah Sennett. In a telephone interview, Deborah told the investigator that she was "100% sure that [Sennett] took a road trip to California to make money" sometime in the fall or early winter of 1983.

The following week, Smothers filed a motion for new trial based in part on the newly discovered evidence contained in the military records and what was revealed by the follow-up investigation conducted by the defense. The purported new evidence was that Sennett was not stationed in Texas at the time of Carter's murder, and that he took a road trip to California between Thanksgiving and Christmas 1983 for a job. According to the defense's motion, "[h]ad the defense been able to present evidence connecting Kevin Sennett to California in December 1983, the DNA found under [Carter's] fingernails would have likely been given considerably more weight in the minds of the jury."

On October 5, 2018, the court heard the new trial motion. It concluded Deborah's live testimony was necessary, so it set an evidentiary hearing which took place on November 1, 2018. Deborah was the sole witness to testify. She testified that Sennett was her ex-husband. They were married in 1982. In 1983, they were living in Wisconsin Rapids, Wisconsin, and

Sennett was in the Army reserves. Other than when he was in military camp or busy with the reserves on the weekends, they lived together.

Deborah further testified that right after Thanksgiving 1983, Sennett left on a trip with his brother, Brian Sennett, and a friend, Raymond Gilliam. He did not tell Deborah where he was going. Sennett was gone for about two to two and half weeks. When he returned right before Christmas, Deborah figured he went to California based on a Raiders jacket he brought back for her. He also came back from this trip with cash. Deborah said Sennett and Gilliam had gone on trips together previously. On the one trip with them that Deborah joined when she was pregnant with her son, Sennett and Gilliam left her alone in a parking lot for almost three hours. When they returned they had cash. On November 5, 2018, the court denied the new trial motion.

The court sentenced Smothers to 25 years to life in state prison. Smothers now appeals.

## DISCUSSION

### A. Pre-accusation Delay

Smothers argues the trial court abused its discretion when it denied his motion to dismiss the indictment against him on grounds of pre-accusation delay. We disagree.

#### 1. Background

Before trial, Smothers moved to dismiss the indictment against him on grounds that the nearly 33-year delay in prosecuting a 1983 offense violated his state and federal constitutional rights to due process and caused him severe prejudice. He specified over two dozen ways the delay adversely affected his defense, which included lost physical evidence, lost witnesses, impaired memories, and non-existent or impossible to obtain evidence. After

32

an evidentiary hearing and two days of argument, the court denied the motion, and the case proceeded to trial.

As Smothers notes, the trial court provided a very thorough explanation of its reasoning. The court found only one of Smothers's alleged losses, namely, Smother's deceased mother who could not testify that Smothers cried when she told him news of Carter's death, to be slightly prejudicial. On the other hand, it found the prosecution's justification for the delay "quintessentially reasonable." On balance, the trial court concluded the "strong justification" for the delay outweighed the minimal amount of prejudice.

Following trial, the court also denied a renewed motion to dismiss based on pre-accusation delay.

### 2. *Applicable Law*

A delay between the commission of an offense and the filing of a criminal charge does not implicate the constitutional right to a speedy trial. (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 505.) However, the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution " 'protect[ ] a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.' " (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) Although the statute of limitations is the general guarantee against the bringing of criminal charges in an untimely

33

fashion, a defendant's due process rights under the state and federal constitutions may be violated by an unreasonable delay in bringing criminal charges. (*Ibid*.)

In determining whether a criminal defendant's due process right has been violated, courts employ a three-step test. (*People v. Catlin* (2001) 26 Cal.4th 81, 107 (*Catlin*).) The defendant has the initial burden of showing prejudice as a result of the delay; the prosecution then must show justification for the delay; thereafter, the court balances the harm against the justification. (*People v. Reeder* (1984) 152 Cal.App.3d 900, 909–910.)

"The burden of proof for establishing such a claim rests with the defendant." (*People v. Price* (1985) 165 Cal.App.3d 536, 542.) Under both the state and federal Constitutions, a defendant must make a threshold showing of actual prejudice before the trial court is called upon to balance the prejudice to the defendant against the justification for the delay. Under the federal Constitution, a claim based on pre-accusation delay requires showing the delay was undertaken to gain a tactical advantage over the defendant. (*Catlin*, *supra*, 26 Cal.4th at p. 107; *United States v. Lovasco* (1977) 431 U.S. 783, 795.) Under the state Constitution, " ' "the defendant has the initial burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations]. The showing of prejudice requires some evidence and cannot be presumed." ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 874, italics omitted.)

" 'We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation].' " (*People v. Jones* (2013) 57 Cal.4th 899, 922 (*Jones*).) Whether the defendant was prejudiced by a delay and whether the delay was justified are questions of

fact. (*People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1330.) Thus, on appeal, we examine whether the trial court's prejudice and justification findings are supported by substantial evidence. (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 911–912.) "[W]e consider all evidence that was before the court at the time the trial court ruled on the motion." (*Jones*, at p. 922.)

*Nelson*, *supra*, 43 Cal.4th 1242, is instructive. There, a woman was killed in 1976, and police interviewed the defendant as a suspect shortly after the body was found. (*Id.* at p. 1248.) After an extensive police investigation, no charges were filed and the case became an inactive cold case. (*Ibid.*) In 2000, the county began hiring and training analysts to solve sexual assault cases that lacked suspects, and the instant case was put in line for DNA analysis. (*Id.* at pp. 1248–1249.) In July 2001, the case was reviewed and semen stains found on the victim were tested. (*Id.* at p. 1249.) The results matched the defendant's DNA profile, and he was identified as a potential source of the semen stain. (*Ibid.*) In 2002, the defendant was arrested. (*Ibid.*)

The defendant moved to dismiss the case for precharging delay. (*Nelson*, *supra*, 43 Cal.4th at p. 1249.) The court found the "the justification for the delay was strong," and that it was an "investigative delay, nothing else." (*Id.* at p. 1256.) While the police had some basis to suspect the defendant of the crime shortly after it was committed in 1976, it was not until 2002 that law enforcement agencies could solve the case when the comparison of defendant's DNA with the crime scene evidence resulted in a match. (*Ibid.*) It was only at that point that the prosecution believed it had sufficient evidence to charge the defendant. (*Ibid.*) Rejecting the defendant's claim that the 26-year delay in bringing charges violated his constitutional

rights to a fair trial and due process, the Court affirmed the denial of the motion to dismiss. (*Ibid.*)

### 3. *Analysis*

Even assuming Smothers met his burden of demonstrating prejudice, substantial evidence similar to that in *Nelson* supported the trial court's finding that there was "strong justification" for the delay and that the delay was "quintessentially reasonable." In this case, law enforcement agencies believed there was insufficient evidence to charge Smothers in 1983, and at that time DNA analysis did not exist. DNA analysis for law enforcement purposes was not available until the mid-1990s but those analyses yielded results with less specificity and greater uncertainty than later DNA protocols. In addition, the Crime Lab needed to validate the new technology before implementing it into casework, so it was not until 2001 that the Lab approved the use of the more advanced DNA analysis that was ultimately used to match Smothers's DNA with the evidence at the crime scene.

At some point, Richmond Police leadership identified Carter's case as a good candidate for DNA analysis. Even so, there was ample evidence that neither the Richmond Police nor the Crime Lab had the means to investigate exhaustively every single active case they received or cold case selected for reopening. Tuan Nguyen, a deputy sheriff forensic supervisor who began working at the Crime Lab as an analyst in 2005, testified that around the time Carter's case was reopened, the Lab had a huge backlog of cases awaiting DNA testing. Further, it generally took analysts 100 days going "pedal to the metal" to complete a case after receiving it. Nguyen also explained that the Lab prioritized recent, or "fresh," homicide and rape cases over cold cases, so cases like Carter's were worked on as time permitted.

Evidence of the county's limited resources and the need to allocate those resources was further apparent in the manner evidence from Carter's case was processed. At the evidentiary hearing, Lt. Johanson stated she received the case in 2008 and reviewed the case to assess the available evidence. She met with the Crime Lab supervisor to decide how to select evidence to be examined in light of the case's large volume of evidence. They did not want to overwhelm the Lab's capacity and sought to prioritize the evidence that would give them the best opportunity to find DNA evidence of Carter's murderer. They decided that evidence would be submitted to the Lab in phases, and Lt. Johanson sent the first batch of evidence to the Lab in 2008 and other pieces followed in separate batches.

The Lab completed its initial analysis in 2015 when it developed the DNA profile for an unknown male from a couple pieces of evidence. In the months following, the police secured buccal swabs from suspects from the earlier investigation. In 2016, the Lab matched Smothers's DNA to the bloodstains on the nightgown and master bathroom sink. Once law enforcement had the DNA evidence connecting Smothers to the crime scene, there is no question that the prosecution proceeded promptly. In August 2016, the prosecutor convened a grand jury to determine whether there was sufficient evidence to charge Smothers with Carter's murder, and Smothers was arrested shortly after the grand jury returned an indictment. On these facts, we have no trouble concluding substantial evidence supported the trial court's finding that the prosecution's justification for the delay was strong.

Likewise, we have no trouble concluding that on balance the People's strong justification for delay outweighed the various prejudices we assume Smothers suffered. In the weighing process, "the seriousness of the crime for which the indictment is returned must be given appropriate consideration.

The fact that the Legislature has decreed no statute of limitations for murder shows the importance that society places on governmental efforts to bring a murderer to the bar of justice." (*Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 954.) Further, "whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson*, *supra*, 43 Cal.4th at pp. 1255–1256.) In addition, "[i]n balancing prejudice and justification, it is important to remember that prosecutors are under no obligation to file charges as soon as probable cause exists but before they are satisfied that guilt can be proved beyond a reasonable doubt or before the resources are reasonably available to mount an effective prosecution. Any other rule 'would subordinate the goal of orderly expedition to that of mere speed.' " (*People v. Boysen* (2007) 165 Cal.App.4th 761, 777.)

Here, the case involved an unsolved murder. There was nothing in the record indicating the prosecution caused the delay or allowed the case to languish to take advantage of Smothers. Nor was there evidence of prosecutorial negligence. Like *Nelson*, the delay can be characterized as an "investigative delay, nothing more." Even though Smothers was a suspect during the police's 1983 investigation, law enforcement did not believe there was sufficient evidence to charge him then. Only when the DNA evidence from the crime scene resulted in a match with Smothers's DNA did the prosecution believe it had sufficient evidence to seek an indictment. This analysis was not done until 2016, due to the Crime Lab's backlog, its reasonable prioritization of current cases over reopened cold cases, and the

need to allocate limited law enforcement resources. Under these circumstances, the justification for the delay outweighed the prejudice we assume Smothers suffered.

On appeal, Smothers contends that if "the talisman that resources are limited and cold cases can permissibly be shunted year after year to the bottom of the pile" suffices as a reasonable justification for delay, then "there is no point at which what may have once been reasonable becomes unreasonable." He further states that under the trial court's analysis, "it did not matter whether 14 years passed or 50" since the court "deemed judicial inquiry foreclosed in the face of a stated policy of prioritizing new cases over cold ones." We are not persuaded. In *Nelson*, the Supreme Court stated, "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case . . . . '[T]he difficulty in allocating scarce prosecutorial resources . . . [is] a valid justification for delay.' [Citation.] It is not enough for defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson*, *supra*, 43 Cal.App.4th at pp. 1256–1257.) Smothers's contentions amount to no more than the type of criticism against state resource allocation which the Supreme Court rejected.

In any event, we do not conclude that all pre-accusation delays for cold cases in counties with limited resources will always be justified, no matter how long the delay or the reasons for it. We have only decided that under the circumstances of Carter's case, the 33-year delay between her murder and Smothers's indictment did not violate his due process. This is in the ballpark of the 26 years the Supreme Court considered in *Nelson* for cold cases reopened with DNA analysis.

39

## B. Ineffective Assistance of Counsel

We next consider Smothers's ineffective assistance of counsel (IAC) claims. Smothers asserts his trial counsel was ineffective for several reasons, including (1) making evidentiary promises in his opening statement that he did not fulfill; (2) conducting an inadequate investigation; (3) failing to adduce proof regarding Sennett's identity; and (4) failing to object to the prosecution's inadequate and untimely notice of the prosecution's uncharged conspiracy theory. We are persuaded that Smothers's third IAC contention, that defense counsel failed to present the jury with proof of Sennett's identity, has merit and was prejudicial. We do not address Smothers's other IAC claims because in the event of a retrial they are unlikely to recur.

### 1. Applicable Law

A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. "The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

Ineffective assistance claims may be raised and decided on direct appeal, and they can be found meritorious when the record reveals that counsel did not or could not have a reasonable strategic reason for the challenged action or inaction. (See, e.g., *People v. Fosselman* (1983) 33 Cal.3d 572, 581.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*).) "Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

## 2. *Counsel Provided Ineffective Assistance Related to Evidence of Sennett's DNA*

As we have already explained, the trial court granted Smothers's motion allowing admission of the Sennett DNA evidence under a third-party culpability theory. Several days later in trial, the parties again discussed the scope of admissible third-party culpability evidence outside the jury's presence. The prosecutor questioned how defense counsel intended to handle Sennett's DNA, specifically asking whether counsel intended "to produce an actual name as opposed to saying, hey, it's someone else's DNA . . ." The prosecutor expressed concern that any testimony from Estrada-Ballardo regarding the initial hit through CODIS would be hearsay and lacking foundation. He argued the third-party culpability evidence should be narrowly tailored and argued against identifying Sennett by name and how his name was obtained through CODIS.

41

When the court asked defense counsel his intentions regarding the Sennett DNA evidence, he responded, "That's a difficult question and one that I have been grappling with. . . . [¶] I am leaning, and have been leaning, more towards doing it more that there was an individual who came back. In other words, there was this hit, and that there is a third person under the fingernails and leave it generally at that with Ms. Ballardo -- Estrada Ballardo; that there was DNA, as I think I told the jury in my opening, that there was DNA of a third party found under the fingernail that is not Mr. Smothers and kind of leave it at that. [¶] I don't have the obligation to prove -- I have no burden of proof. I don't have to show who it was. So I don't necessarily benefit by putting a name to it, as we did have discussions early on, before Your Honor made the decision while we were going through that, then the DNA was being retested and things of that nature. [¶] The somewhat convoluted manner of getting the Sennett family to California is a journey that I'm not sure I want to revisit in front of the jury. So I don't necessarily need the name."

The next day, the prosecutor stated the following for the record: "What we're going to do is we're going to speak of the nail scrapings, that there was a female contributor from the victim, there was a male profile that was generated, and that that male profile excludes Smothers, Mayfield, and Featherson. [¶] So obviously there is male DNA under her fingernails that is not the suspect, but as far as CODIS and the rest of that information, we won't be going into that." Defense counsel responded, "That is correct and acceptable."

Before the jury, Estrada-Ballardo testified that the partial DNA profile from Carter's fingernail scrapings matched a man who was not Smothers, Mayfield, or Featherson. However, defense counsel did not present any

42

evidence to the jury that Sennett was a possible source of the DNA in the scrapings and never referenced Sennett by name.

In conjunction with his motion for new trial, trial counsel explained the reason he did not present this evidence: "We know we have his DNA under the fingernail. That was confirmed. But I could not, in good faith, place [Sennett] here otherwise, which is the reason, quite frankly, I did not reference him by name in this courtroom or try to, because . . . [I] believe you would have told me that I wouldn't do it because I couldn't connect him." Post-trial, defense counsel learned that Sennett's ex-wife recalled a trip Sennett took between Thanksgiving and Christmas 1983 which she was "100% sure" was to California. Defense counsel explained that Sennett's ex-wife's statement provided him the good faith belief that Sennett was in California in December 1983 when the murder was committed.

The trial court disagreed with counsel's assessment, noting that the fingernail DNA evidence provided a good faith basis to believe that Sennett had come into contact with the victim in California at or around the time of the murder. Further, the court explained that it had expressly ruled "that all evidence relating to Mr. Sennett was admissible; in other words, the third-party culpability issue."

Smothers contends his trial counsel was deficient for not presenting the jury with evidence of Carter's probable killer's identity. Because defense counsel's explanation for withholding Sennett's identity from the jury appears in the record, we decide this IAC claim on direct appeal. (See *Mendoza Tello*, *supra*, 15 Cal.4th at p. 266; *People v. Lucas* (1995) 12 Cal.4th 415, 442 [reversal on direct appeal for ineffective assistance of counsel possible when "the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions"].)

43

Based on the circumstances and counsel's representations to the court, we are compelled to conclude that Smothers's trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. The record affirmatively reflects that defense counsel had no satisfactory tactical reason to not disclose Sennett's identity to the jury in connection with the fingernail scrapings DNA evidence. To the contrary, defense counsel's stated reasons for not presenting the Sennett evidence to the jury appear to be based on counsel's own misconceptions. (Cf. *In re Wilson* (1992) 3 Cal.4th 945, 955–956 ["[c]ounsel's failure to raise a meritorious objection to incriminating evidence as a result of ignorance or misunderstanding" constitutes ineffective assistance].)

First, counsel's belief that he could not reference Sennett by name to the jury because he had no good faith basis to place Sennett in California at the time of Carter's murder was incorrect. As the trial court found, the DNA evidence beneath Carter's fingernails was more than adequate to place Sennett in California. How else would it have gotten there in the absence of Sennett being in contact with Carter who, indisputably, was murdered in California at some point between her home in Richmond and the parking lot where her body was found in Sacramento? The court accurately observed that based on the Crime Lab's analysis, the "defense had definitive proof that Mr. Sennett, his DNA was under the victim's finger nails." Thus, according to the trial court, "[t]he defense knew before trial and had the evidence to prove that Kevin Sennett was in California around the time of the murder because there is no explanation for his DNA under the victim's fingernails other than that he had personal contact with the victim, the victim either scratched him or otherwise drew blood from Mr. Sennett, and that it was likely during the attack." Defense counsel understood this as reflected by

44

comments he made during argument of his motion in limine where he stated, "[J]ust because I don't have a database that says Kevin Sennett was here [in California] in 1983, it doesn't mean he wasn't here in 1983 for some period of time long enough to have had some contact with this victim." Weeks later, when he opted not to present Sennett's name to the jury, he ignored his own sound analysis.

Second, counsel's statement that he did not want to refer to Sennett by name because he believed the court would bar him from doing so absent additional evidence showing a further connection to California was also mistaken. The court never indicated it would take this position. To the contrary, the court had granted Smothers's in limine motion, expressly allowing him to present any third-party evidence related to Sennett's DNA. As we have noted, the court clearly stated in open court, "[T]he DNA evidence relating to Mr. Sennett is admissible because it could create a reasonable doubt as to the defendant's guilt." The court later reminded counsel of that ruling when it decided the new trial motion, stating, "I ruled in favor of the defense that they could present any of this evidence relating to Mr. Sennett's DNA in their case if they chose to do so." The court imposed no conditions/restrictions on its ruling regarding the admissibility of Sennett's DNA. We can think of no tactical reason why counsel would not have wanted the jury to be aware of Sennett's identity and why counsel would not have wanted to argue Sennett was the likely source of the DNA beneath Carter's fingernails.

Defense counsel's decision to withhold Sennett's name is particularly problematic given defense counsel's understanding of how critical it was to Smothers's third-party culpability evidence. For example, counsel had tasked his defense investigator with locating and determining whether Sennett was

45

ever in California. Before trial, he moved in limine to have the evidence showing that DNA belonging to Sennett was found beneath Carter's fingernails. In argument, defense counsel said of Sennett's connection to the DNA evidence: "[T]his is critical evidence as far as the defense is concerned to prove that there was someone else who committed this act and not Mr. Smothers." He later expressed his belief that he did not have to "prove who it was or whether or not that person had a connection to California before [he] can tell this jury about it, what the physical evidence of this case conveys. And that is that there was another person who we now have a name."

Further, in Smothers's motion for new trial, defense counsel argued that had he "been able to present evidence connecting Kevin Sennett to California . . . , the DNA found under [Carter's] fingernails would have likely been given considerably more weight in the minds of the jury." This is a tacit acknowledgement that the DNA evidence beneath Carter's fingernails could have been minimized by the jury because it was given no evidence of to whom it matched. In fact, the jury was told the evidence was the DNA of an unknown male, which was *not* accurate and was misleading.

We recognize the jury found Smothers not to be the actual killer which is consistent with the evidence. However, Sennett's identity and his lack of connection with Smothers or with any of the other potential co-conspirators or with *any* of the other evidence was highly relevant as to whether the prosecution could prove that Smothers entered into an agreement with Sennett to hire him to murder Carter. In this context, defense counsel's decision at trial to not even attempt to adduce evidence about Sennett as a possible source of the DNA beneath Carter's fingernails was unreasonable.

On the eve of DNA analysis expert Estrada-Ballardo's examination, the prosecution revisited the scope of the third-party culpability evidence that

would be introduced to the jury. The prosecution argued that no evidence of Sennett's name or how his identity was obtained be presented to the jury. Unlike before, this time defense counsel did not object to the prosecution's renewed attempt to dilute the third-party culpability evidence and agreed not to mention Sennett's identity. This did not amount to vigorous representation of his client. (See *Magana v. Superior Court* (2018) 22 Cal.App.5th 840, 865 [" '[A]ttorneys owe high duties to their clients to defend their cases fully, vigorously, and even with arguments which might be offensive or ultimately unsuccessful. This is particularly true in criminal cases, where the clients' liberties are at stake, and where the adequacy of the attorneys' representation can raise constitutional issues.' "].)

### 3. Counsel's Conduct was Prejudicial

Since we have concluded Smothers's performance was deficient, we must address whether Smothers suffered prejudice as a result. Ineffective assistance of counsel is prejudicial when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 669 (*Strickland*).) The defendant need not show that it is more likely than not that the outcome of the trial would have been different had the inadequacy not occurred. (*Id.* at p. 693.) We also conclude that trial counsel's deficient representation was prejudicial to Smothers.

Here, the prosecution relied on alternative theories to establish Smothers's culpability for Carter's murder. Based on the charges and the alleged enhancement for his use of a dangerous weapon, the prosecution's primary theory was that Smothers was the actual perpetrator of Carter's murder. Alternatively, the prosecution also pursued Smothers under an

uncharged conspiracy theory. As we have already mentioned, since the jury found Smothers guilty of first degree murder but found the enhancement that Smothers used the weapon that killed Carter to be not true, the jury must have adopted the prosecution's theory that Smothers conspired with someone else to kill Carter and that she was stabbed by someone other than Smothers at Smothers's request.

While it was theoretically possible that the jury believed Smothers conspired with Mayfield, the evidence does not support this conclusion. Mayfield's DNA profile did not match any of the DNA profiles generated from evidence at the crime scene. Besides the DNA on the nightgown and in the bathroom sink (which matched Smothers's DNA profile), the only other DNA evidence from the case resulting in a match was from the scrapings beneath Carter's fingernails. The jury learned another male's DNA had been found beneath Carter's fingernails. Based on this evidence, the jury likely concluded that Smothers enlisted this unidentified male to assist him and convicted Smothers for conspiring with this unnamed male to kill Carter.

" 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 120; *People v. Morante* (1999) 20 Cal.4th 403, 416 [a conspiracy is an express or tacit agreement between two or more persons to commit any crime, followed by an overt act committed by at least one of them for the purpose of furthering the object of the agreement].) "To prove a conspiracy to commit a crime the prosecution need not show that the parties met and expressly agreed to commit a crime. [Citations.] The

evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 311.)

Featherson's testimony provided the only evidence of a conspiracy to commit murder. Since the jury was told the identity of the male whose DNA was underneath Carter's fingernail scrapings was unknown, the jury could have inferred from Featherson's testimony that Smothers found someone else in the neighborhood besides Featherson or Mayfield to carry out his murder plan. According to Featherson, the only individuals Smothers approached for aid were people in the neighborhood—himself, Mayfield, and at one point another friend named Vincent. When Featherson declined to ride with Smothers and Mayfield the evening Smothers asked him to, and his friend Vincent also declined, a juror could have reasonably inferred Smothers approached someone else in the neighborhood or another mutual friend like Vincent who was willing to help Smothers with his plan on short notice. A juror could have reasonably inferred that this late-joining coconspirator was the source of the DNA found in the scrapings beneath Carter's fingernails.

Featherson's testimony did not support a conspiracy in which someone like Sennett was a member. For example, Featherson never mentioned that Smothers told him an out-of-state hitman or contract killer was (or could have been) part of the plan to kill Carter. Further, as an Army reservist living in Wisconsin, there is absolutely no evidence that Sennett had any connection to those in Smother's Oakland neighborhood where Featherson testified Smothers approached others for help.

49

According to Featherson, on the night Smothers carried out his murder plan, he scrambled for assistance once Featherson refused to help him. The notion that Smothers located Sennett and arranged for him to assist Smothers on December 6th when his "local options" fell through that evening is hard to reconcile given Sennett was not someone from the neighborhood, like Featherson or Mayfield, and readily available to ride along with him. Had Smothers made arrangements with Sennett well in advance, which would have been necessary given Sennett's residence in Wisconsin, his efforts to recruit help from the neighborhood up until hours before the murder makes little sense.

Most importantly, there was *absolutely no evidence* of any connection between Smothers and Sennett, and no proof of a certain or tacit agreement between the men to kill Carter. For example, the jury was not told 1) about any evidence of phone records that connected them, 2) about any financial transactions that may have occurred between them, 3) whether they had common acquaintances or friends, and 4) whether they had ever even met or spoken to each other. In our exhaustive review of the record, we have found zero evidence, direct or circumstantial, tying Sennett to Smothers. In the absence of any evidence of a connection between the two men, a juror would not have been able to reasonably infer that Smothers had the specific intent to enter into an agreement with Sennett to murder Carter, as required under a conspiracy to commit murder theory. It becomes easy to see how introducing Sennett's name into evidence as a possible source of the DNA beneath Carter's fingernails would have exposed holes in the prosecution's conspiracy theory through which it secured Smothers's conviction.[2]

---

[2] The People observe that the prosecution also pursued Smothers under an aiding and abetting theory of liability, which "had elements that were essentially identical to the conspiracy theory." They contend that "any

50

The People contend that Smothers's claim his counsel was deficient "is no more than forbidden second-guessing of counsel's judgment" and that counsel's decision not to give the jury evidence of Sennett's identity reflected a "tactical choice" based on a reasonable belief counsel could not conclusively show it was Sennett who was the third party. We disagree. Defense counsel's own explanation revealed no tactical reasons behind his decision to hold back Sennett's identity. Rather, the decision was premised on his erroneous beliefs that 1) something more than the DNA match was necessary to place Sennett in California at the time of Carter's murder, and 2) the court would prohibit him from introducing Sennett's identity, notwithstanding the court's earlier in limine ruling allowing counsel to introduce that very evidence.

The People further argue Smothers cannot show prejudice based on defense counsel's failure to give the jury evidence of Sennett's identity since it was not evidence that would have raised the probability of a different result. The People reject the assertion that telling the jury that Sennett was the unknown party would have undermined Featherson's testimony because it changed the nature of Smothers's purported murder plot. Again, we are not persuaded.

---

possible prejudice from the prosecutor's conspiracy theory arguments would be negated by the propriety of the aiding and abetting theory." Under this theory, too, there was no evidence that would have supported Smothers's conviction as an aider and abettor and Sennett as the perpetrator. To prove Smothers guilty under an aiding and abetting theory, the People are required to prove that he knew the perpetrator intended to commit the crime and that his words and conduct did in fact aid and abet the perpetrator's commission of the crime. (CALCRIM Nos. 400, 401.) On this record, there was no evidence of Sennett's intent, or any words exchanged or interactions between Smothers and Sennett.

51

According to the People, the fact that Smothers did not share with Featherson that he was in contact with Sennett (or some other unknown third party) would not have been a surprise to the jury because it was plain from the evidence that Smothers did not fully trust Featherson and withheld much information from him.  Given the level of detail that Featherson claimed Smothers revealed to him about the murder plot, it seems unlikely that Smothers would not have disclosed the possible participation of a hired killer.  For example, according to Featherson's initial statement to the police, Smothers was planning to let Featherson inside the house and he wanted Featherson to strangle Carter.  Smothers talked about their approach and division of labor if Mayfield joined in the plot.  Smothers even explained where they would take Carter's body and reviewed maps with Featherson.

The People contend, "There is no reason to assume [Smothers] could not have run into Sennett either by happenstance, or through a mutual acquaintance, any time in the days before the murder."  The People further add that the jury was well aware that this was "always a paid murder-for-hire plot" and "the idea that [Smothers] ended up paying Sennett, however appellant came across Sennett, would not have been at all surprising, even if appellant's connection to Sennett was unexplained."  However, there was no evidence (direct or circumstantial) that even *hints* at such an encounter.  There was no evidence of any phone calls or financial exchanges between the two.  There was no evidence of any mutual acquaintance or circumstances that would have prompted Sennett, an Army reservist, to travel with friends all the way from Wisconsin to be in contact with Smothers, a newspaper delivery man in Oakland, to engage in a murder plot.

The People also argue that even if it was Sennett who was the unknown killer, "there was no reasonable possibility that the jury would have

52

thought Sennett acted on his own." According to the People, the jury had "three compelling legs of proof of [Smothers's] guilt": (1) Featherson's statement to police and Smothers's unexplained statements in the wiretaps telling Featherson not to talk to the police; (2) Smothers's DNA in Carter's master bathroom; and (3) Featherson's "painful return from Wisconsin to testify in this case, with an illness he knew was about to end his life." Sennett, however, is not ingrained into any of these "legs." Sennett's name, or that of a hired hitman, never came up in Featherson's statement to police. While Smothers's wiretap statements to Featherson are not what one would expect a totally innocent person to say, they, too, do not refer to any agreement with Sennett or a third party to kill Carter. Smothers's DNA in the master bathroom obviously places Smothers in Carter's bathroom at some time near when the murder was committed, but it does *not* establish evidence of any connection between Smothers and Sennett. Featherson's conditional examination testimony, which the People describe as "unexplainable except as a testament to the truth by a dying man," provided ample evidence for a murder conspiracy but never included Sennett in that conspiracy.

Accordingly, we are compelled to find that trial counsel was ineffective for failing to present evidence of Sennett's identity to the jury, and that the failure to do so was prejudicial to Smothers. We reverse on this basis. (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1148 ["We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission."].) We need not address Smothers's other IAC claims given these issues are unlikely to recur in the event of retrial. In light of our reversal, we also do not reach Smothers's claims of error related to the motion for new trial or cumulative error as, they too, are unlikely to recur in the event of retrial.

53

## D. Uncharged Conspiracy Instruction

Although we need not reach the issue of whether the court erred in its uncharged conspiracy instruction, in light of our reversal, we will do so here to provide guidance to the trial court if a retrial of this matter is conducted. (See *People v. Neely* (1993) 6 Cal.4th 877, 896.)[3]

Smothers contends the court committed an instructional error when it allowed the jury to convict him of an uncharged conspiracy without finding an essential element of the charge, namely, that he and the killer had an agreement to murder. Smothers contends the court had a sua sponte duty to tailor CALCRIM No. 416 (CALCRIM 416) to the facts and issues of the case but erroneously did not do so. In Smothers's view, the absence of specification in the instruction left jurors "free to conclude . . . that any person who killed [Carter], by virtue of that fact alone, was acting pursuant to an agreement with [Smothers] and, consequently, [Smothers] could be held liable for that killing." He contends he "was denied the jury's consideration of what should have been an essential element if it were to convict him on a conspiracy-based murder theory, namely, that the perpetrator of the murder and defendant were coconspirators in the uncharged conspiracy to commit murder." Relatedly, he contends that "although the court had a sua sponte duty to explain that defendant could not be found guilty through a conspiracy theory based on murder committed by one who was not a coconspirator of defendant, it did not do so." We agree on both points. In light of Smothers's

---

[3]    As an initial matter, the People argue Smothers forfeited this claim on appeal because he did not object or request a clarifying or amplifying instruction. Since we offer this analysis for guidance, we will proceed to consider Smothers's arguments on the merits without addressing the People's forfeiture contention.

multiple possible coconspirators, clarification of the uncharged conspiracy instruction, if given, may be appropriate on retrial.

California Supreme Court decisions have " 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." ' " (*People v. Valdez* (2012) 55 Cal.4th 82, 150.)

The court has a sua sponte duty to give CALCRIM 416, Evidence of Uncharged Conspiracy, when the prosecution has not charged the crime of conspiracy but has introduced evidence of a conspiracy to prove liability for other offenses. (*People v. Williams* (2008) 161 Cal.App.4th 705, 709 (*Williams*).) The instruction sets forth the four elements that the prosecution must prove for an uncharged conspiracy. As stated in CALCRIM 416, the first element the People must prove is that "[t]he defendant intended to agree and did agree with [one or more of] (the other defendant[s]/[or]

_____"<insert name[s] or description[s] of coparticpant[s]>)

to commit _____<insert alleged crime[s]>[.]"[4] Accordingly, when giving the instruction, the Judicial Council directs trial courts to insert the names or otherwise describe the other person(s) involved in the conspiracy, when they are not the defendant's codefendants. The Bench Notes to CALCRIM 416

---

[4]  The other elements for an uncharged conspiracy are: (2) at the time of the agreement, the defendant and the other member(s) of the conspiracy intended that one or more of them would commit the crime; (3) the defendant or the other member(s) of the conspiracy committed an overt act to accomplish the crime; and (4) the overt act was committed in California. (See *Williams*, *supra*, 161 Cal.App.4th at pp. 709–710.)

underscore the point, stating: "In elements 1 and 3, insert the names or descriptions of the alleged coconspirators if they are not defendants in the trial." (See CALCRIM No. 416.)[5]

Instructional error is determined from the entire charge of the court, not by isolated parts of the instructions or from one particular instruction. (*People v. Smithey* (1999) 20 Cal.4th 936, 963–964.) Rather, a reviewing court reads the instructions as a whole to determine whether there is a reasonable likelihood they confused or misled the jury. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 341.) We presume the jurors understood, correlated, and correctly applied the instructions. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) "The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Here, the court granted the prosecution's request, and instructed on uncharged conspiracy with CALCRIM 416. The instruction was as follows: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy. [¶] To prove that the defendant was a member of a conspiracy in this case, the People must prove that: [¶] 1. The defendant intended to agree and did agree with one or more other persons to commit murder; [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder;

---

[5] Although CALCRIM Bench Notes do not have the force of law (see *People v. Alvarez* (1996) 14 Cal.4th 155, 223, fn. 28), reviewing courts look to them for guidance. (See, e.g., *Williams*, *supra*, 161 Cal.App.4th at p. 709.)

[¶] 3. The defendant, or a co-conspirator, or both of them, committed at least one of the following overt acts to accomplish the murder: [¶] (a) Travel to Marsha Carter's residence; [¶] (b) Entry into Marsha Carter's residence; and [¶] (c) Killing of Marsha Carter; [¶] AND [¶] 4. At least one of these overt acts was committed in California."

The court further instructed, "To decide whether the defendant and the other alleged member of the conspiracy intended to commit murder, please refer to the separate instructions that I will give you on that crime. [¶] The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit th[e] crimes. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime."

As we have repeatedly noted, the jury found Smothers guilty of the first degree murder of Carter but found the enhancement that Smothers personally used the weapon that killed her to be not true. As we have stated before, based on these verdicts, the trial court observed that "the jury's verdicts in this case are most consistent with the theory that [Smothers] conspired with Mr. Mayfield and/or a third person, which obviously is likely to be Mr. Sennett, to kill his girlfriend and that she was stabbed by someone other than [Smothers] at [Smothers's] behest."

The court did not follow the Judicial Council's Bench Note to "insert the names or descriptions of alleged coconspirators if they are not defendants in the trial" in its CALCRIM 416 instruction. The court neither named or described Smothers's alleged coconspirators, stating only that the People had to prove that "[t]he defendant intended to agree and did agree with one or

57

more other persons to commit murder." Given the evidence supported the possible existence of multiple coconspirators (Mayfield, Featherson, and Sennett), the absence of names or descriptors could have readily led to jury confusion. Absent names or descriptions of the coconspirators, a reasonable juror could conclude that it did not matter who Smothers's alleged coconspirators were. The jurors could have believed that *any* person who killed Carter was acting pursuant to an agreement with Smothers without finding Smothers and the killer had actually entered into a conspiratorial agreement. A rational juror could have concluded that the unidentified male contributor of the fingernail DNA was the actual killer (especially since the Crime Lab's analysis excluded Smothers and Mayfield), and that he conspired with Smothers to kill Carter. CALCRIM 416, as modified, would have permitted the juror to find Smothers guilty even when there is absolutely no evidence in the record that Smothers and the unidentified male had any connection, or ever entered into an agreement to commit murder.[6]

In addition to providing the suggested specification and tailoring by inserting the names or otherwise describing the others involved in the conspiracy, Smothers states "[a]ll that needed to be done to ensure the jury would consider all the requisite elements of conspiracy liability was to include language such as that found in CALCRIM No. 417 (CALCRIM 417). We agree. CALCRIM 417, denominated "Liability for Coconspirators' Acts," states, "A member of a conspiracy is criminally responsible for the crimes

---

[6] The People do not dispute that the action of a "*non*-member of a conspiracy" cannot confer liability on those who are a part of a conspiracy, and they further assert several reasons why the court's CALCRIM 416 instruction resulted in "no reasonable likelihood of a misunderstanding" that would have allowed a conspiracy conviction based on a non-member's conduct. It is unnecessary to address the People's arguments in light of a possible retrial with modified instructions.

that he or she conspires to commit, no matter which member of the conspiracy commits the crime." (CALCRIM No. 417.) According to the Bench Notes, the following paragraph should also be given "when supported by the evidence": "The defendant is not responsible for the acts of another person who was not a member of the conspiracy even if the acts of the other person helped accomplish the goal of the conspiracy." (CALCRIM No. 417, Bench Notes.) Given the evidence in this case includes DNA evidence in Carter's fingernail scrapings that matched a man who appears nowhere in the prosecution's primary witness' rendition of the conspiracy, such an additional instruction would be supported by the evidence. At the risk of stating the obvious, the addition of such an instruction would make it more clear that Smothers could only be convicted of murder on a conspiracy theory if there was evidence beyond a reasonable doubt that he conspired with the actual murderer.[7]

## DISPOSITION

The judgment is reversed and remanded.

---

[7] Another option would be a "hybrid general verdict form," which accompanies a general verdict form, thereby allowing the jury to also make special findings. (See *People v. Gurule* (2002) 28 Cal.4th 557, 632 [approving hybrid general verdict forms in contrast to special verdicts which are not approved in criminal trials]; *People v. Davis* (1995) 10 Cal.4th 463, 511 [special "findings" may accompany a general criminal verdict, even if not expressly authorized by statute, as long as they do not interfere with the jury's deliberative process].) For example, the jury could be asked whether it found Smothers and each coconspirator specifically intended to enter into an agreement to murder Carter or something to that effect.

59

_____

Wiseman, J.*


WE CONCUR:


_____

Petrou, Acting P.J.


_____

Jackson, J.


A156081/*People v. Smothers*

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:          Contra Costa County Superior Court

Trial Judge:          Hon. John W. Kennedy

Counsel:              Xavier Becerra, Attorney General, Lance E. Winters, Chieg
                      Assistant Attorney General, Jeffrey M. Laurence, Senior
                      Assistant Attorney General, Donna M. Provenzano,
                      Supervising Deputy Attorney General, and David H. Rose,
                      Deputy Attorney General for Plaintiff and Respondent.

                      Law Offices of Gary K. Dubcoff, Gary K. Dubcoff, for
                      Defendant and Appellant.